The Federal National Bank of Shawnee, Oklahoma v. Commissioner.
Federal Nat'l Bank of Shawnee v. Commissioner
Docket No. 15342.
United States Tax Court
1949 Tax Ct. Memo LEXIS 183; 8 T.C.M. (CCH) 534; T.C.M. (RIA) 49135; May 18, 1949
*183 Gross income: Exclusions: Proceeds from life insurance policy. - Since taxpayer's return indicated only that a life insurance poliy had been acquired for some consideration, and he failed to sustain the burden of proving the amount of such consideration, the entire proceeds less collection expenses were properly included in gross income by the Commissioner. John E. Marshall, Esq., Commerce Exchange, Oklahoma City, Okla., for the petitioner. John P. Higgins, Esq., for the respondent. DISNEY
Memorandum Findings *184 of Fact and Opinion DISNEY, Judge: This case involves a deficiency in income tax in the amount of $8,494.79 for the year 1944. The petition also alleges overpayment in the amount of $2,658.51. The only issue to be determined is whether the net proceeds of a life insurance policy held on the life of one Patrick H. Adams, in the amount of $19,645.24, should be included in petitioner's gross income for the year 1944. Some of the allegations of fact in the petition are admitted in respondent's answer, hence we find from these and the evidence, both documentary and oral, the following Findings of Fact The Federal National Bank of Shawnee, Oklahoma, petitioner herein, filed its corporation income and declared value excess-profits tax return for the year 1944 with the collector of internal revenue for the district of Oklahoma. In its return for 1944, petitioner reported an adjustment not recorded on its books in an amount of $23,942.36 with only the following explanation: "Proceeds of New York Life Insurance Policy on the life of Pat Adams. "This Policy was assigned to bank by the State Banking Commissioner and Pat Adams as collateral on loans taken over by the bank from the *185 failed Security State Bank in 1920. Subsequent to 1920 the Bank has charged off various amounts of these loans taken over against earnings. These charge offs were made in years in which no tax benefit was derived by reason of the charge offs. "It is the postion of the Bank that recovery on this collateral insurance policy does not constitute income. "Amount of proceeds of policy $23,942.36." In his notice of deficiency, respondent added $19,645.24 to petitioner's gross income with the following explanation: "During the year 1944, you received the proceeds of a life insurance policy on the life of Patrick H. Adams in the amount of $23,942.36 which was not included in gross income on your return. It has been determined that the insurance policy was acquired by you for a consideration, and that the entire amount of the proceeds therefrom, less legal fees and expenses totalling $4,297.12 expended in the collection of such proceeds, is includible in your gross income. Accordingly your income is increased $19,645.24." On or about June 25, 1919, the New York Life Insurance Co. had issued and delivered to Patrick H. Adams a $20,000 life insurance policy. Adams was a debtor of the *186 Security State Bank and he had assigned his interest in the policy to the bank as collateral security as its interest may appear. In 1920 he was indebted to the Security State Bank for an amount of about $40,000 or $50,000. On and before December 13, 1920, the Security State Bank, a corporation, was a banking institution organized and existing under the banking laws of Oklahoma, with its principal place of business at Shawnee, Oklahoma. On December 13, 1920, the State Bank Commissioner of Oklahoma declared the Security State Bank insolvent, took charge of its books, records and assets, and proceeded to wind up its affairs, collect the debts and obligations due to it, and pay off its depositors, as provided by law. The book value of the assets of Security State Bank on December 13, 1920, were $1,307,607.76. This consisted of intangible assets, except $10,000 furniture and fixtures. On December 14, 1920, the Guaranty State Bank, a corporation, was organized with authorized capital stock of $50,000 and a paidin surplus of $10,000. It began business as a banking institution under the laws of Oklahoma, with its principal place of business at Shawnee, Oklahoma. On December 14, 1920, the *187 State Bank Commissioner, as party of the first part, and the Guaranty State Bank, as party of the second part, entered into a contract, providing, in pertinent part, that Guaranty State Bank purchased at face value assets and resources of Security State Bank, totaling $425,652.67, including loans and discounts of $350,000; that the Bank Commissioner guaranteed payment of the $350,000 loans and discounts; that in payment Guaranty State Bank assumed and agreed to pay liabilities of Security State Bank in the amount of $752,832.51, but the liabilities assumed being in excess of Guaranty State Bank's purchase, the Bank Commissioner paid the difference, $327,179.84 in checks and warrants to Guaranty State Bank; that all other assets of Security State Bank were pledged to Guaranty State Bank as collateral against loss on the assets purchased by it; that at the end of eighteen months a final accounting should be had, the Bank Commissioner then to receive any pledged assets remaining. Guaranty State Bank fully performed its part of the contract, but it was unable to collect more than $210,000 on the loans and discounts receivable by the end of eighteen months from the date of the contract, *188 and the State Bank Commissioner then became obligated to Guaranty State Bank, on his guarantee, for payment of $140,404.94. Guaranty State Bank made demand upon the State Bank Commissioner for payment. Due to insufficient funds in the guarantee fund, the State Bank Commissioner was unable to meet his obligation. On July 10, 1922, an agreement was entered into between the State Bank Commissioner and the Guaranty State Bank, whereby, in full satisfaction of the claim against the State Bank Commissioner, the Guaranty State Bank accepted the sum of $30,000 in cash and all the remaining assets of the Security State Bank of every kind and character then in the hands of the Guaranty State Bank, whether held as collateral under the contract dated December 14, 1920, or as separate property of the State Bank Commissioner, except hypothecated notes and bills receivable of the Security State Bank in the total face amount of $112,134.06. One of the remaining assets of the Security State Bank then in the hands of the Guaranty State Bank as collateral was the $20,000 life insurance policy on the life of Patrick H. Adams. The bank also held by assignment another $5,000 policy on the life of Adams. *189 On November 10, 1922, the Guaranty State Bank paid premiums on the Adams policy in the amount of $821.20. On March 24, 1923, the Federal National Bank of Shawnee, Oklahoma, petitioner herein, was organized and on that date acquired all the assets and assumed all the liabilities of the Guaranty State Bank and caused the dissolution of the Guaranty State Bank. The transactions constituted a taxfree reorganization. About December 1924 Adams assigned the life insurance policy to the petitioner in consideration of the dissolution of his account with the bank and the return to him of a mortgage of $4,000 to $6,000 which he had placed with the bank as collateral to his open account. He was released from all liability for paying anything further on the account. Petitioner paid premiums on the Adams policy, on the dates and in the amounts, as follows: Dates
Amounts
November 10, 1923
$821.20
November 10, 1924
821.20
November 10, 1925
821.20
November 10, 1926
821.20
November 10, 1927
821.20
November 10, 1928
821.20
November 10, 1929
80.00
Petitioner's income tax returns reflect the following information on Schedule L - reconciliation of net income and *190 analysis of changes in surplus: Premiums paid on
Year
life insurance
1925
$ 985.92
1926
1,012.77
1927
1,101.05
1928
186.85
1929
381.50 These amounts were not reflected as deductions from gross income in calculating the net income for tax purposes for the respective years. Patrick H. Adams died March 9, 1941. Proof of death was made and, after litigation, the New York Life Insurance Company paid the petitioner during the taxable year 1944, the amount of $20,000, together with interest at 6 per cent from April 30, 1941, totaling $23,942.36. The cost of collecting the proceeds of the life insurance policy was $4,297.12. In its income tax return for the year 1922, the Guaranty State Bank charged off $22,451.99 as bad debts. The income tax returns of the petitioner for the years 1923 to 1929 show the following charge-offs for bad debts: 1923
$ 2,267.81
1924
30,254.66
1925
18,957.73
1926
3,301.74
1927
4,143.74
1928
24,032.92
1929
28,947.63 A revenue agent's report dated August 26, 1937, shows unallowable deductions for bad debts for the years 1924 and 1925 in the amounts of $12,002.99 and $17,877.10, respectively. Some of the *191 bad debts charged off during the years 1924 to 1929, inclusive, represent loans made by petitioner and some represented paper taken over from the State Bank Commissioner. For 1924 virtually all were loans taken over from the Bank Commissioner. Opinion The petitioner urges first that the determination of deficiency was arbitrary and capricious, without rational foundation, invalid on its face, relieving the petitioner from the burden of proof, under the rationale of Helvering v. Taylor, 293 U.S. 507, and that we erred in holding that the burden of proof was on the petitioner. His argument is, in substance, that the determination of deficiency recites that the insurance policy was acquired for a consideration, yet determines that the entire proceeds of the policy (less only collection expense) is includible in petitioner's gross income, all contrary to section 57 of the Internal Revenue Code, requiring the Commissioner to determine the correct amount of tax, and, inferentially, to section 22 of the Internal Revenue Code as to income and treatment of proceeds of insurance policies assigned for valuable consideration. We, therefore, *192 first consider whether petitioner was relieved of the usual burden of proof. In our opinion, petitioner overworks section 57. Though it requires the Commissioner to determine correct tax, it does not disregard the fact that the Federal system of income taxation is one of self-assessment, through rendition of income tax returns by the taxpayer, and that the Commissioner acts upon the return and the information therein. Indeed, that this is true inheres in the language of section 57 itself for its says only that: "As soon as practicable after the return is filed the Commissioner shall examine it and shall determine the correct amount of the tax * * *" obviously from such examination of the return. The petitioner here would have the Commissioner determine the correct tax at his peril, even aside from the return. The law does not so require. Examination of the petitioner's return, as required of the Commissioner, demonstrates at once that the determination was not without rational basis, arbitrary or capricious; for though the determination of deficiency did recite that the insurance policy "was acquired by you for a consideration" but holds the entire proceeds, except collection expense, *193 to be income, the petitioner itself, in the return, had disclosed the fact of acquisition of the policy by its predecessor, as collateral on loans taken over, and the fact that "subsequent to 1920 the Bank has charged off various amounts of these loans taken over against earnings," but adds that "These charge offs were made in years in which no tax benefit was derived by reason of the charge offs." Thus it becomes clear that in his examination of the return the Commissioner was put upon notice that the original consideration for the acquisition of the policy might be affected or diminished by the facts as to charge offs against earnings and the question of fact as to whether or not tax benefits were derived from such charge offs. In the light of this it seems to us plain that the deficiency notice merely recognized that there was acquisition in the first instance for consideration, but is by no means arbitrary or capricious in not deducting from the insurance proceeds all such consideration, in the face of the admissions, by the return, of charge offs against income, which might or might not, when examined in connection with the facts as to tax benefits, affect the amount of consideration *194 remaining to be considered as against the insurance proceeds, for under section 22 (b) (2) of the Internal Revenue Code only the acctual value of the consideration for assignment of the policy (and premiums and other sums subsequently paid) is to be exempt from taxation in case of transfer of the policy for valuable consideration. In our opinion, not only was the Commissioner not arbitrary and capricious in the determination of deficiency, but he would have failed in his duty had he acted otherwise. He had before him a return indicating acquisition of an insurance policy, as collateral, for some consideration, but raising questions, without information, as to the amount. (The return for 1944 stated no facts as to the $10,000 paid-in surplus lost, or insurance premiums paid, or mortgage released - the facts upon which petitioner now places reliance to establish consideration for the assignment of the policy.) Patently the mere reference to "acquired by you for a consideration" is no admission, in the light of the return, that the consideration was as great as the insurance proceeds, so that taxation of any amount would be arbitrary. The determination of deficiency *195 put the taxpayer upon proof of the facts, not set forth in the return but suggested thereby to involve charge-offs without tax benefits, and of its contention, stated in the return, that "recovery on this collateral insurance policy does not constitute income." The mere mention of consideration, under the facts here, does not shift to the respondent the burden of proof instead of leaving it on the petitioner and its records on the history of this "collateral insurance policy." The Government has a right to full disclosure of facts upon which a claim is based. O'Laughlin v. Helvering, 81 Fed. (2d) 269. We proceed, therefore, to examine the proof made as to the consideration, premiums paid and other payments contended for by the petitioner upon the assigned life insurance policy, exempt from taxation under section 22 (b) (2) of the Code. The proceeds are otherwise taxable. Waters, Inc, v. Commissioner, 160 Fed. (2d) 596; cert. den., 332 U.S. 767. The position advanced by petitioner on the merits and evidence is that instead of having taxable income from the policy it had suffered a loss of $183.16, computed as follows: 1. Paid-in surplus lost
$10,000.00
2. Insurance premium paid
5,828.40
3. Release of mortgage
4,000.00
Total
$19,828.40
Amount received from proceeds of
insurance policy, less legal fees
and expenses
19,645.24
Loss
$ 183.16
*196 We consider such points in the order raised: 1. Paid-in surplus lost: The evidence on the point is: Petitioner's president testified at the hearing, as follows: "Q. Do you know what became of that paid in surplus? "A. We used it to take up the loss we had in connection with the Bank Commissioner's contract. "Q. And do you recall what year that was you lost that? "A. We charged it off on December 31, 1922." He also testified, when asked whether income was reduced because of debts becoming worthless: "We charged it over into surplus. I just testified to that. We charged over about $12,000.00 - about $1200.00 or $1500.00 on December 31, 1922; and in order to do so, to get things cleaned up, to make it look like things had been cleaned up, we used our surplus account to do that, which was $10,000.00." Such testimony is not sufficient to show that the $10,000 paidin surplus when lost was consideration for the life insurance policy on the life of Adams. The words "used it to take up the loss" appear to be intended to have a technical meaning in bookkeeping. Such evidence should have been further substantiated. The Guaranty State Bank's tax return for 1922 was placed in evidence *197 by the respondent, for another and limited purpose. This transaction being one affecting surplus for that year, it appears natural that the tax return, had it been offered without limited purpose, could have indicated what disposition was made of the $10,000 surplus, particularly since a corporate tax return carries a form for a schedule to show any changes made in the surplus account. The petitioner caused the return to be admitted for a limited purpose, instead of being admitted in general, and did not itself offer the return. We are not convinced by the sparse evidence on the point that the $10,000 paid-in surplus was "lost" in any transaction whereby it could be considered as part of the basis of the life insurance policy on the life of Adams to petitioner. 2. Insurance premiums paid, $5,828.40: We have found as a fact that the Guaranty State Bank paid premiums on the Adams policy in the amount of $821.20 during the year 1922, and that petitioner paid that same amount each year 1923 to 1928 and $80 during 1929, the total amount of these payments being $5,828.40. We also have found as a fact that for the years 1925-1929 amounts specified as premiums paid on life insurance, appearing *198 on Schedule L of the tax returns, were not reflected as deductions from gross income in calculating petitioner's net income for tax purposes for the respective years. The connecting fact that the payment of the premuims on the Adams life insurance policy were included in the amounts appearing on Schedule L, above mentioned, is lacking. In fact, there is some evidence that leads us to believe that the payments on the Adams policy were not included in the amounts, for petitioner paid $821.20 on the Adams policy during 1928 but only $186.85 appears in Schedule L as premiums paid on life insurance. The record contains no explanation of this difference. Furthermore, there is no evidence concerning the treatment given any payments of premiums on any life insurance policies for the years 1922, 1923, and 1924. Again, the premiums shown on Schedule L of the returns may have been on other policies. The record shows another policy of $5,000 on the life of Adams duly assigned to the petitioner, but fails to show whether other policies were carried on other lives. Due to failure of proof, we hold that petitioner has not established any basis in the Adams policy because of the fact of payment *199 of any premiums on the Adams life insurance policy. From the evidence before us we have no way of determining how petitioner treated the amounts paid as premiums. Without proof to the effect that the amounts were not deducted from gross income in determining net income for tax purposes we can not say that the amounts should be added to the base of the consideration paid for the policy. Any other conclusion might give petitioner a double deduction. 3. Release of mortgage: We consider the evidence wholly inadequate to sustain petitioner's position as to the third item, above mentioned, "Release of mortgage" in the amount of $4,000. The Adams life insurance policy was originally assigned to the Security State Bank, as collateral security for Adams' debts, as "its interest may appear." The policy then passed to the State Bank Commissioner, after which it was assigned to the Guaranty State Bank, then passed to petitioner. The Guaranty State Bank acquired the life insurance policy on Adams' life as the result of a contract dated July 10, 1922, the circumstances of the transaction being that the State Bank Commissioner became obligated on his guarantee for the payment of $140,404.94. *200 Due to insufficient funds in the guarantee fund, the State Bank Commissioner was unable to meet his obligation. In full satisfaction of this claim against the State Bank Commissioner, the Guaranty State Bank accepted $30,000 in cash and all the remaining assets of the Security State Bank of every kind and character then in the hands of the Guaranty State Bank (except certain hypothecated notes and bills receivable of Security State Bank in the total face amount of $112,134.06). One of the remaining assets, above mentioned, passing to Guaranty State Bank was the life insurance policy on the life of Adams. The testimony of petitioner's president, in regard to the release of a mortgage on Adams' house in the amount of $4,000, is, of itself, not sufficient to establish the basis contended for by petitioner, in the light of other evidence. The record before us contains no information in regard to the circumstances connecting the insurance policy with the alleged $4,000 - release of the mortgage on Adams' house. Under the circumstances, we think the evidence requires more than a mere statement on the part of the bank's president that the bank "dissolved" his (Adams') account and gave him *201 back a mortgage of "between $4,000 or $6,000" on his house. The mortgage was, like the insurance policies, collateral on Adams' open account. The evidence is merely that the bank had a mortgage of "between $4,000 or $6,000" on Adams' house. Whether that was the face amount or the amount remaining unpaid at the date of assignment of the policy to the bank does not appear. Moreover, the value of the mortgage depends upon the value of the property mortgaged, and nothing before us indicates such value. It may have been much less, or much more, than the $4,000 claimed as consideration. Under these circumstances we can not logically hold that there is proof of the $4,000 consideration. Without evidence as to the amount of Adams' indebtedness at the time of assignment of the policy, its value, or the value of the property, or whether the $4,000 was charged off as bad debt, we can not say that the surrender of the mortgage constituted consideration for the policy. Nor do we see any theory, other than that suggested by the petitioner, upon which petitioner should be sustained. In 1922, 1923, and 1924 about $55,000 was charged off for bad debts. Since the absolute assignment from Adams was *202 about December 1924, there is nothing to indicate that this amount was not all charged off while the policy was held purely as collateral. The record contains no information concerning the position petitioner (or its predecessor) took in regard to the treatment of indebtedness of Adams on tax returns filed for the period 1922-1929. The charge-offs may have been against the Adams debt orginally of $40,000-$50,000, with tax benefit. In such case St. Louis Refrigerating & Cold Storage Co. v. United States, 162 Fed. (2d) 394, would seem to require taxation of the collections later made on the bad debt charged off. Aside from consideration of that case, it is apparent that the $110,000 was aggregate consideration for acquisittion of two collateralized insurance policies, and a large amount of bank paper and assets. Any collections made, and charge-offs against such assets, would require adjustment downward of such consideration. The record shows nothing as to tax benefit from charge-offs. Section 22 (b) (2) permits exemption from taxation only of the "actual value" of the consideration. The value would be reflected by such adjustments. There were total charge-offs of $111,906.22 *203 by petitioner alone, not including $22,451.99 charged off by Guaranty State Bank in 1922, much more than the $110,404.94 (after payment of the $30,000 by the Bank Commissioner on the $140,404.94), and division thereof between the old Security State Bank paper and later loans by petitioner is not shown. In 1924 "virtually all" were the former. In addition we should consider any collections made. Collections were not denied. Petitioner's president testified that he could not state the amount of collections, "Nobody could." It is not reasonable to think that there were not substantial additional collections on bank paper which the Guaranty State Bank had had for collection only eighteen months at the time the Bank Commissioner assigned it outright in settlement of his $140,404.94 guarantee on July 10, 1922. Moreover, the record before us does not show the amount of Adams' indebtedness on July 10, 1922, when the policy-collateral passed from the Bank Commissioner to Guaranty State Bank. Thus, even viewing the policy separately, the "actual value" of the consideration for it is unknown. Nor are we informed by the record as to what part of the charge-offs, in any year, before or after *204 July 10, 1922, were charged off against the Adams debt. Obviously charge-offs against it, after acquisition of the policy by petitioner as collateral, would decrease the consideration. The burden being on petitioner to prove its case, in the light of its failure in this respect, we hold for respondent. Decision will be entered for the respondent.